UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JAMES L. HERRINGTON, | Case No. 2:12-cv-01648-AC |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| S. HODGE, Medical Services Manager, SRCI; MICHAEL F. GROWER, Assistant Administrator, Operations Division, ODOC; S. SHELTON, M.D., Medical Director, ODOC; ESTATE OF DR. JODEAN ELLIOTT-BLAKESLEE, by and through its Personal Representative, Kathleen Elliott; DR. BRISTOL, SRCI; R.N. NEIL, SRCI; R.N. FOLKMAN, SRCI, | |
| Defendants. | |

ACOSTA, Magistrate Judge:

*Introduction*

James Leroy Herrington ("Herrington") filed this lawsuit *pro se* under 42 U.S.C. § 1983 alleging violations of his Eighth and Fourteenth Amendment rights. Herrington alleges violations by Dr. Elliott-Blakeslee (deceased); Dr. Bristol; Registered Nurse Hodge, Medical Services Manager

("R.N. Hodge"); Registered Nurse Neil ("R.N. Neil"); and Registered Nurse Folkman ("R.N. Folkman") who are all employed by the Snake River Correctional Institution ("S.R.C.I."), where Herrington is currently incarcerated; as well as against Dr. Shelton, Medical Director; and Michael Gower, Assistant Administrator, Operations Division, who are both employees of the Oregon Department of Corrections ("O.D.O.C.") (collectively "Defendants"). (Second Am. Compl. ("Complaint"), ECF No. 74, at 3.) Herrington alleges Defendants violated his Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment by providing constitutionally deficient medical care for a broken foot Herrington suffered in late April, 2009. (Complaint at 8; Herrington Dep., ECF No. 199-1, at 6:15-7:3-4.) Defendants moved for summary judgment on May 1, 2015. Herrington filed a response to Defendants' motion for summary judgment[1] and an opposing motion for summary judgment as to defendant Dr. Elliott-Blakeslee, on May 16, 2016. Based on the record before it, the court grants Defendants' motion for summary judgment and denies Herrington's motion as moot.[2]

*Preliminary Procedural Matters*

I.     Dr. Yao Report

"A trial court can [] consider [only] admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002). Generally, "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on

---

[1]The court provided Herrington with a Summary Judgment Advice Notice on May 5, 2015. (ECF No. 154.) The Notice informed Herrington of the Rule governing summary judgment, the consequences to his case if the motion is successful, what he must do to properly oppose the motion, and the deadline within which to file his opposition.

[2]The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). However, "courts in this circuit have routinely held that unsworn expert reports are inadmissible." *Harris v. Extendicare Homes, Inc.*, 829 F. Supp. 2d 1023, 1027 (W.D. Wash. 2011); *also see*, *AFMS LLC v. United Parcel Serv. Co.*, 105 F. Supp. 3d 1061, 1070 (C.D. Cal. 2015) (holding that report attached to declaration of counsel, although signed, was not sworn under penalty of perjury to be true and correct and therefore inadmissible); *Shuffle Master, Inc. v. MP Games LLC*, 553 F. Supp. 2d 1202, 1210 (D. Nev. 2008) ("the purpose of allowing affidavits or declarations at summary judgment is to consider testimony that would be admissible at trial. To be admissible, the testimony must be sworn. . . . It clearly follows, and is well established, that an unsworn expert report is inadmissible.") (collecting cases).

Defendants attach expert medical opinion evidence from Dr. Eric Stephen Yao as an exhibit to their motion for summary judgment (the "Report"). ( Defs.' Mot. for Summ. J., ECF No. 153, Exh. 1, at 1.) The Report is not a sworn affidavit, nor is it a declaration made under penalty of perjury; it is simply an unsworn report. It is therefore, not presented in an admissible form and will not be considered. FED. R. CIV. P. 56(c)(4).

II.    Authentication of Herrington's Exhibits

   A.   *Administrative Grievances and Grievance Appeals*

Evidence presented in support of or in opposition to a motion for summary judgment must be based on personal knowledge, properly authenticated, and admissible under the Federal Rules of Evidence. FED. R. CIV. P. 56(c) (2015). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. CIV. P. 901(a) (2015). Evidence that is not

properly authenticated will not be considered by the court when reviewing a motion for summary judgment. *Orr.*, 285 F.3d at 773.

Herrington attaches copies of his administrative grievance and grievance appeals submitted to prison authorities and their responses to his Response in Opposition to Defendants Motion for Summary Judgment ("Response"). (*See* Resp. in Opp'n to Mot. for Summ. J. ("Resp."), ECF No. 199-1, Exhs. 4-9.)[3] Herrington does not, however, provide any authentication for these documents. Herrington fails to establish any personal knowledge these documents are what they purport to be, nor does he provide any grounds for authentication by any manner permitted by Federal Rule of Evidence 901(b) or 902, either of which would satisfy the requirements of Rule 56(c). *See Orr*, 285 F.3d at 774. In fact, Herrington does not even mention these documents in his Response. As a result, Herrington has failed to properly authenticate these documents and they are, therefore, inadmissible.

### B.   *Herrington's Deposition Transcript*

Herrington also attaches a copy of his entire deposition transcript. (Resp. in Opp'n to Mot. for Summ. J. Attach. 1, ECF No. 199-1, at 1-71.) "A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent." *Orr*, 285 F.3d at 774. Herrington's deposition transcript contains all the requisite elements. (Dep. at 1, 71.) Consequently, Herrington's deposition transcript is admissible.

---

[3]Herrington does not provide any exhibits numbered two or three, so the exhibits skip directly from exhibit 1, Herrington's deposition transcript, to exhibit 4, Herrington's first grievance form.

III.     Herrington's Conclusions and Personal Opinions in Deposition Testimony

Rule 701 of the Federal Rules of Evidence ("Rule 701") permits a lay person to offer testimony in the form of an opinion if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific technical, or other specialized knowledge within the scope of [Federal Rules of Evidence] Rule 702" (governing the admissibility of expert testimony).  FED. R. EVID. 701. Herrington's deposition contains many conclusions and personal opinions about his medical treatment and various defendants.  For example, Herrington testified, "[R.N. Neil] totally blew the diagnosis" (Dep. at 25:4); "I should have went to the hospital when [R.N.] Folkman first said, you know, I think you have a fractured bone in your foot" (*id.* at 35:21-24); "[t]here is no excuse for [Dr. Elliott-Blakeslee] not sending me to the hospital right then" (*id.* at 46:4-5); and, "I know in my Complaint that I list [R.N. Wilcox] as extortion, which in my opinion that is what [paying for the orthotic insert] is due to the definition of extortion, you know, of when anybody says you have to give me canteen or you have to do this or you won't get this or we'll do this" (*id.* at 49).  However, "[c]onclusory allegations unsupported by factual data cannot defeat summary judgment." *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir.2003).  Therefore, to the extent Herrington's deposition includes medical opinions and unsubstantiated conclusions of law, those statements will not be considered.

*Background*

The following facts are taken from Herrington's Second Amended Complaint ("Complaint"), filed December 26, 2013, and his deposition testimony.  Herrington organizes the claims in his Complaint by separating the claims against each particular defendant, starting with "the most

involved defendant on down to the least involved." (Herrington Dep., 22:25-23:1.) The court will similarly separate the claims by defendant, with the exception of those claims involving Herrington's grievance and grievance appeals, which are sufficiently similar to be taken together. The court will address the claims in chronological order for clarity.

I.     R.N. Neil

Herrington claims he broke his foot on or around April 27, 2009, as he was trying to get out of the way of other inmates who were playing basketball. (Herrington Dep., 6:15-19, 7:3-4.) At some point in the next two days, Herrington was seen by R.N. Neil at sick call about pain in his foot. (*See* Complaint at 8-9; Herrington Dep., 23:1-2.) Herrington told R.N. Neil how he injured his foot saying, "he heard a loud snapping sound followed by intense pain" and that he thought it was broken. (Complaint at 8-9.) At this time, Herrington's foot was swollen and badly bruised from his ankle down to his toes. (*Id.* at 9.) After examining Herrington's foot, R.N. Neil initially told him she thought he had gout. (*Id.*) Upon further examination, she revised her diagnosis and told Herrington a "[c]ellulose deposit" was causing the swelling and bruising. (*Id.*) R.N. Neil prescribed medication to treat a cellulose deposit and Tylenol to help with the pain. (*Id.*) Herrington asked if the medication would have an effect on his liver, concerned it might exacerbate his Hepatitis C, but R.N. Neil assured him the medication would not affect his liver. (*Id.*) Herrington took the prescribed medication for only two days, claiming that on the third day, his "feces had turned grey in color, an indication that his liver was under extreme stress." (*Id.*) Herrington continued to use the Tylenol however, to help with the pain. (*Id.*)

II.    R.N. Folkman

Though the record is unclear as to a certain date, Herrington was seen at sick call by R.N.

Folkman some days, or possibly weeks later (the record is unclear). (*Id.* at 10; Herrington Dep., 31:9-32:2; 35:18-19.) After plaintiff took off his shoe, R.N. Folkman immediately informed Herrington she thought he might have a fractured bone in his foot. (Complaint at 10.) Herrington asked if he would be transferred to the local emergency facility but R.N. Folkman told him they had to take x-rays at the institution first. (*Id.*) R.N. Folkman then told Herrington the radiologist might not be available for x-rays until almost a week later (though Herrington was actually able to get x-rays taken the next day). (*Id.*; Herrington Dep., 35:12-14.) Herrington asked about something for the pain and R.N. Folkman prescribed him ibuprofen. (Complaint at 10.)

III.    Dr. Elliott-Blakeslee

Shortly after having his foot x-rayed, Herrington saw Dr. Elliott-Blakeslee. (Complaint at 4.) Dr. Elliott-Blakeslee identified a fracture of the fifth metatarsus of Herrington's right foot. (*Id.*) According to Herrington, "[t]he fracture is described as a diagonal separation, and miss-alignment [sic] of the bone that occurred near the joint of the First Phalanges from the upper side of the Metatarsus proceeding diagonally for approximately one inch to the lower side of the Metatarsus towards the ankle." (*Id.*) Dr. Elliott-Blakeslee issued an orthopedic boot to Herrington to "stabilize his foot" and "help with the pain as well." (*Id.* at 5.) Herrington asked if he was going to be transported to the local hospital for further treatment, and Dr. Elliott-Blakeslee informed him she would arrange an appointment for him to see an orthopedic surgeon. Herrington asked when the appointment would be and was told it would be about a month before he could see the surgeon. (*Id.* at 4-5.) In addition to the orthopedic boot, Dr. Elliott-Blakeslee also prescribed Tylenol and ibuprofen to help with the pain and swelling in Herrington's foot. (*Id.* at 5.)

Thereafter, Herrington saw Dr. Elliott-Blakeslee "around once a month for the following

eighteen months." (*Id.*) Around March of 2010, roughly eleven months after the injury, Herrington had a conversation with Dr. Elliott-Blakeslee, in which he asked: "'[w]hat is going to be done about my foot?' Dr. Elliott[-]Blakeslee's response was, '[w]hat do you want me to do?' [Herrington] told Dr. Elliott[-]Blakeslee, 'I want my foot fixed.' Dr. Elliott-Blakeslee told [him], '[w]e're not going to fix your foot, you have an Orthopedic insert to wear in your shoe, and that's it.'" (*Id.*)

IV.     R.N. Wilcox

Though it is not specifically mentioned, the record suggests Herrington saw R.N. Wilcox roughly four or five months after the injury. (Herrington Dep., 46:-48.) Herrington apparently saw R.N. Wilcox on call-out to the medical department because had to sign a "CD 28." (Complaint at 11; Herrington Dep., 47:5-8, 48:2-8.) The CD 28 was a document Herrington was required to sign to acknowledge his indebtedness to the Therapeutic Level of Care Committee ("TLCC") for the cost of the custom orthotic insert prescribed by Dr. Davis, the orthopedic surgeon who had seen Herrington about his foot. (Herrington Dep., 47:5-48:8.) R.N. Wilcox told Herrington that the price of the insert was approximately $69.00. (Complaint at 11.) Herrington said he did not have the money to pay for it and refused to sign, so he did not receive the insert at that time. (*Id.*) After speaking with some friends, Herrington reconsidered and within a week went back to sign. (*Id.*; Herrington Dep., 48:22-49:9.) When he went back though, R.N. Wilcox explained to him that the price was now $175, telling him the increase was the result of a different vendor. (Complaint. at 11; Herrington Dep., 49:10-17.) Herrington signed the CD 28 and received his custom insert. (Complaint at 11.) To pay for the insert, the institution "took 50 percent of [Herrington's] monthly earnings, 50 percent of any money that was sent in from outside until this $175 was paid off." (Herrington Dep., 49:19-22.) Through this process, Herrington was able to pay the full $175 within

nine-to-twelve months.  (*Id*. at 50:13.)

V.     R.N. Hodge, Dr. Shelton, Michael Gower

Herrington filed a grievance form on May 5, 2010, to which R.N. Hodge responded on May 25, 2010.  (Complaint at 12.)  In his grievance, Herrington identified several issues he thought were mishandled during treatment for his broken foot, including the misdiagnosis by R.N. Neil; R.N. Folkman insisting on having x-rays taken at the institution and not sending him to the emergency room; and Dr. Elliott-Blakeslee prescribing only an orthopedic boot and ibuprofen to treat his broken foot.  (*Id.*.)  Although it is unclear if Herrington complained of this in his original grievance, R.N. Hodge addressed the change in price for the orthotic insert, but apparently did not address Herrington's other complaints to his satisfaction, including the issue of Dr. Elliott-Blakeslee telling him that nothing more would be done for his foot.  (*Id.* at 12-13.)

Unsatisfied with R.N. Hodge's response to his original grievance, Herrington filed a grievance appeal on or around June 5, 2010, and received a response from Dr. Shelton on July 14, 2010.  (*Id.* at 13.)  Herrington's appeal "contained many of the same issues that were included in [his] original" grievance.  (*Id.*)  Herrington's appeal also specifically included complaints about the price of the orthotic insert; R.N. Folman's supposed "reputation for being short, angry, and disrespectful to inmates"; as well as an apparent mix up of radiological reports, providing a report about Herrington's finger instead of his foot.  (*Id.* at 14.)  According to Herrington's Complaint, Dr. Shelton did not adequately respond to any of these issues.[4]  (*Id.*)

Unsatisfied with Dr. Shelton's response as well, Herrington filed a second grievance appeal

---

[4] There is no admissible evidence in the record that shows definitively what Dr. Shelton was able to address in his response to Herrington.

Page 9 - OPINION & ORDER                                                                                           [JSR]

dated July 27, 2010. (*Id.* at 15.) This appeal again "listed basically the same complaints" as the original grievance and first grievance appeal. (*Id.*) According to Herrington, Gower did not respond to any specific complaints and instead addressed issues Herrington had not brought up, such as the treatment history of Herrington's foot. (*Id.*) Gower also responded by saying it was "Health Services Policy that [Herrington] is responsible for the full cost of [the orthotic insert]." (*Id.* at 16)

VI.     Dr. Bristol

Herrington saw Dr. Bristol for pain in his foot in December 2010, more than a year and a half after the injury. (Complaint at 7.) Dr. Bristol ordered x-rays and prescribed Tylenol and ibuprofen for the pain and any inflammation. (*Id.*) The next month, Herrington saw Dr. Bristol again and received the results of the x-rays. (*Id.*) Dr. Bristol told Herrington that the bone had healed but that there was a deformity because the bone had not set properly. (*Id.*) Herrington complained that he thought "he wouldn't be having so much trouble with his foot if it had been properly treated when the injury first occurred." (*Id.*) Dr. Bristol responded by saying that if Herrington had gotten surgery when it originally happened, his foot might be in better shape, "'[b]ut foot surgery can cause more problems than the initial problem itself.'" (Herrington Dep., at 20:6-7.) Herrington claims to have been seen by Dr. Bristol about "once a month since December, 2010, including around the time [Herrington] first filed his original Civil Rights Complaint." (Complaint at 7.)

*Legal Standard*

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Conversely, summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party bears the burden of establishing that no issue of fact exists and that the nonmovant cannot prove one or more essential elements of a claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the nonmovant must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

On a motion for summary judgment, the court must view all the facts in a light most favorable to the nonmovant and must draw all justifiable inferences in the nonmovant's favor. *Narayan v. EGI, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion of evidence. FED. R. CIV. P. 56(c). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation omitted).

*Discussion*

Defendants move for summary judgment, arguing Herrington received proper treatment for his broken foot and, additionally, Defendants are qualifiedly immune from damages. Herrington responds that the treatment he received was constitutionally deficient and that the only correct course of action would have been to transport him to the emergency room for treatment. The parties appear to be in general agreement on the facts of the case, but disagree as to whether those facts constitute a violation of Herrington's Eighth Amendment right to be free from cruel and unusual punishment with regard to the medical treatment of his broken foot.

A § 1983 claim against a government official entails a two-part analysis. To succeed on such a claim, a plaintiff must show, "first, [that he] suffered a deprivation of a constitutional or statutory right; and second [that such] right was clearly established at the time of the alleged misconduct." *Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016) (quoting *Taylor v. Barkes*, __ U.S. __, 135 S. Ct. 2042, 2044 (2015) (per curium)) (internal quotation marks omitted). A court may decide for itself which step of the analysis to address first, for failure on either step will negate a plaintiff's ability to recover. *Hamby*, 821 F.3d at 1090. Therefore, absent a constitutional violation, no further inquiry is necessary, and judgment is entered for the official. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Similarly, if the court determines the constitutional right was not clearly established at the relevant time, judgment is entered for the official. *Hamby*, 821 F.3d at 1090. "To be clearly established, a right must be sufficiently clear that *every* reasonable official would have understood that *what he is doing* violates that right." *Id.* (emphasis in original) (quoting *Taylor*, 135 S. Ct. at 2044) (internal quotation marks omitted). This means that "a plaintiff must prove that 'precedent on the books' at the time the officials acted 'would have made clear to [them] that [their actions]

violated the Constitution.'" *Hamby*, 821 F.3d at 1091 (quoting *Taylor*, 135 S. Ct. at 2045).

The constitutional right at issue in this case is the Eighth Amendment right to be free from cruel and unusual punishment. This right is violated when prison medical officials act, or fail to act, with deliberate indifference to an incarcerated prisoner's serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Therefore, a plaintiff must demonstrate both (1) the existence of serious medical needs, and (2) that prison medical personnel acted with deliberate indifference to those needs. *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citing *Estelle*, 429 U.S. at 104).

Deliberate indifference includes both an objective and a subjective component. Objectively, an official's conduct must pose "a risk of 'objectively, sufficiently serious' harm." *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995)). Harm is objectively sufficiently serious when a "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.* (citing *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled in part on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *Estelle*, 429 U.S. at 104).

Subjectively, the official must also possess a "'sufficiently culpable state of mind' in denying the proper medical care." *Clement*, 298 F.3d at 904 (quoting *Wallis*, 70 F.3d at 1076). Deliberate indifference "describes a state of mind more blameworthy than negligence . . . [and] requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer v. Brennan*, 511 U.S. 825, 835 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). The subjective element "is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). "Deliberate indifference is a high legal standard. A showing of medical malpractice or negligence

is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

"It is well established that pain from a broken bone constitutes a serious injury.*"* *Millard v. Oregon Dep't of Corr.*, No. 2:12-CV-01244-SI, 2014 WL 2506470, at *7 (D. Or. June 3, 2014) (citing *Jett*, 439 F.3d at 1096 n.1 (9th Cir. 2006) (noting that it was "undisputed that [the plaintiff's] fractured thumb was a serious medical need"). Thus, Herrington's broken foot constitutes a serious medical need as a matter of law. This does not mean that Herrington has proven a constitutional violation; it simply means that he has satisfied the first element of a deliberate indifference claim — demonstrating a serious medical need. Thus, the issue for the court to decide is whether the various Defendants acted with deliberate indifference to Herrington's serious medical need. The court will address each defendant in turn.

I.      R.N. Neil

Herrington contends that R.N. Neil's incorrect diagnoses and failure to refer him to a radiologist for x-rays constitute deliberate indifference. Though R.N. Neil did, in fact, incorrectly diagnose Herrington twice, her actions do not constitute deliberate indifference to Herrington's serious medical need. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106.

R.N. Neil's diagnosis and treatment for a cellulose deposit may have been negligent, but it does not rise to the high legal standard of deliberate indifference. In fact, though her diagnosis was

incorrect, the prescription of medication for the cellulose deposit and Tylenol for the pain tends to show that she was attempting to adequately treat the conditions she believed Herrington suffered from. Thus, even if R.N. Neil's actions could be considered medical malpractice, they still do not rise to the level of a constitutional violation because they do not evidence "a purposeful act or failure to respond to a prisoner's pain." Therefore, her actions do not satisfy the subjective element of a deliberate indifference claim. *Jett*, 439 F.3d 1096. As a result, Herrington has failed to establish a genuine issue of material fact with regard to R.N. Neil.

II.     R.N. Folkman

R.N. Folkman advised Herrington his foot might be broken and arranged for him to have x-rays taken the next afternoon. Herrington claims that R.N. Folkman should have arranged for him to be taken to the local emergency facility as soon as she suspected his foot was broken. Herrington does not however, allege any specific harm resulted from R.N. Folkman's treatment. As such, Herrington fails not only to raise a triable issue of material fact but, more fundamentally, fails to state a claim against R.N. Folkman entirely.

III.    Dr. Elliott-Blakeslee

Dr. Elliott-Blakeslee prescribed and provided an orthopedic boot for Herrington to wear to help stabilize his foot and reduce the pain. Dr. Elliott-Blakeslee also prescribed Tylenol and ibuprofen to help with the pain and swelling in Herrington's foot. Herrington maintains that this treatment was unacceptable and that he should have been immediately transported to the local hospital.

"A mere 'difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference.'" *Toguchi*, 391 F.3d at 1058 (quoting *Jackson v. McIntosh*, 90 F.3d 330,

332 (9th Cir. 1996)). "Rather, to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058 (quoting *Jackson* 90 F.3d at 332).

Herrington has made no showing that his treatment was medically unacceptable under the circumstances; he has shown only that he disagrees with the treatment he received from Dr. Elliott-Blakeslee. As this represents a mere difference of opinion — and not even a difference of opinion between medical professionals — Herrington's claims against Dr. Elliott-Blakeslee fail to establish deliberate indifference as a matter of law. Thus, Herrington fails to raise a genuine dispute of any material fact with regard to Dr. Elliott-Blakeslee.

## IV.    R.N. Wilcox

R.N. Wilcox asked Herrington to sign a CD 28 form to charge his inmate account $69 for the orthotic shoe insert prescribed by Dr. Davis, and, a week later, explained that the price was actually $175 because the institution was using a different vendor. Herrington maintains the institution should pay for his medical treatment and that requiring him to pay for his insert constitutes extortion. However, he has not alleged any specific harm or violation proximately caused by R.N. Wilcox's care. Furthermore, absent an allegation he was denied treatment because he could not afford the insert, the prison's policy of charging a fee for medical treatment does not constitute deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 408 (9th Cir.1985) (finding no facts alleged the court could construe as deliberate indifference where prisoner did not allege he was denied treatment as a result $3 fee for medical visits policy). In fact, by signing the CD 28, Herrington was able to immediately receive the benefits of his

prescribed treatment despite not being able to afford the full cost at that time. Therefore, because Herrington was not denied medical treatment, despite not being able to afford it at the time, his claims of deliberate indifference as to R.N. Wilcox fail as a matter of law. Herrington fails to raise a genuine issue of material fact with regard to R.N. Wilcox.

V.     R.N. Hodge, Dr. Shelton, and Michael Gower

Herrington's claims against R.N. Hodge, Dr. Shelton, and Gower are essentially the same: that they did not respond adequately to his grievances in that they failed to remedy what he perceived to be deficient medical care. However, Herrington does not allege any specific harm caused by these three defendants, though he does seem to imply in his Complaint that he believes they should have "correct[ed]" the actions of R.N. Neil, R.N. Folkman, and Dr. Elliott-Blakeslee (presumably, by arranging surgery for his foot). (Complaint at 13.) Even if Herrington's wish for R.N. Hodge, Dr. Shelton, or Gower to schedule surgery can be construed as an allegation of harm, it represents a mere difference of opinion as to his treatment and fails to constitute deliberate indifference as a matter of law. *Toguchi*, 391 F.3d at 1058. As a result, Herrington fails to raise a genuine issue of material fact with regard to claims against R.N. Hodge, Dr. Shelton, and Gower.

VI.    Dr. Bristol

Approximately a year-and-a-half after Herrington's initial injury, Dr. Bristol opined that if Herrington had gotten surgery before the bone had healed, his foot might be in better shape. He also stated surgery can sometimes create greater problems than the initial injury itself.

Herrington makes no explicit claims of harm against Dr. Bristol, though read generously, the Complaint seems to allege Herrington believes surgery is necessary while Dr. Bristol does not. Once again, this represents merely a difference of opinion, which is insufficient to constitute

deliberate indifference as a matter of law. *Id.* Therefore, Herrington fails to establish a genuine issue of material fact with regard to Dr. Bristol.

In summary, Herrington fails to produce sufficient evidence to support his allegations that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment. Herrington produces evidence only of potential negligence and differences of medical opinion, neither of which are sufficient to constitute deliberate indifference as a matter of law. As a result, Herrington fails to establish a triable issue of material fact. Therefore, no reasonable juror could find Defendants acted with deliberate indifference to Herrington's serious medical need. Furthermore, as no constitutional violation has occurred, the court declines to reach or address the issue of qualified immunity.

*Conclusion*

Based on the foregoing conclusions, Defendants' Motion for Summary Judgment (ECF No. 153) is GRANTED. Consequently, Plaintiff's Motion for Partial Summary Judgment (ECF No. 196) is DENIED as moot.

DATED this 12th day of August, 2016.

/s/ John V. Acosta

JOHN V. ACOSTA
United States Magistrate Judge